* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Holmes. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Holmes with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times, an employer-employee relationship existed between plaintiff and defendant-employer.
3. At all relevant times, defendant-employer was insured for injuries sustained under the North Carolina Workers' Compensation Act by Corporate Claims Management, Inc.
4. Defendants accepted plaintiff's November 16, 1999 claim of injury to the left arm as compensable by Form 21 approved on February 6, 2002. After additional surgery on November 21, 2002, defendants resumed payment of TTD, which has continued since that date.
5. Relevant medical records have been stipulated as evidence.
6. Depositions have been received from the following: Leanna Hollenbeck, MS, CRC, Raymond Boylston, Dr. Scott Wallace, Michael Niewladomski, Ph.D, Dr. Jeffrey Kneisl, Dr. Thomas Heil and Dr. T. Kern Carlton.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the deputy commissioner, plaintiff was 54 years old. On August 26, 1999, he was hired to be a senior maintenance worker for the Adams Mark Hotel in Charlotte. His duties were primarily to paint and to supervise other painters. He also would perform minor mechanical, plumbing or electrical work and he would order materials for the painters. On November 16, 1999, he was assisting a crew of employees who were changing a broken shaft in the hotel's air handling unit. At the direction of the maintenance department's supervisor, Ray Hewitt, the crew was attempting to slide one end of the 100 pound shaft through the center of six fan units, while the other end of the shaft was balanced on top of a wooden 2' x 4' which in turn was sitting on top of a cinder block. The worker at the end of the shaft let the shaft go, the board flew out from under the shaft and struck plaintiff in the left elbow, injuring it.
2. In 1993, plaintiff had suffered a severe fracture of the left elbow while working for another employer when he fell from a ladder, striking his elbow on a concrete floor. The elbow was repaired by orthopedic surgeon Jeffrey Kneisl at Carolina Medical Center, using internal fixation hardware. As a result of his 1993 elbow injury, plaintiff developed reflex sympathetic dystrophy (RSD), also referred to as complex regional pain syndrome (CRPS), in his left arm. Various courses of physical therapy and pain management followed as directed by Dr. Kneisl. Plaintiff was also treated for psychological problems stemming from his chronic pain and disability by J. Scott Wallace, M.D., and Joseph Parisi, Ph.D., of Eastover Psychiatric Group.
3. Plaintiff's arm pain stabilized and became controllable sometime around 1998. Plaintiff saw Dr. Wallace in April and August of 1999, prior to returning to the work force by taking the job at defendant Adams Mark Hotel.
4. On the date of the Adams Mark injury, plaintiff was referred by his employer to OccMed at Charlotte Orthopedic Specialists. Dr. Beard of that practice examined plaintiff and referred him back to Dr. Kneisl for further evaluation. Plaintiff continued working, but as his pain continued to increase over time, he called Dr. Kneisl's office for pain medications and returned to see him on a regular basis beginning March 15, 2000. Dr. Kneisl prescribed Tylox. Plaintiff also returned to see Dr. Wallace, but Dr. Parisi had previously left the practice and was no longer available to workers' compensation patients.
5. Although, prior to the re-injury, plaintiff's medication usage had been stable, consisting primarily of Soma, Flexeril, Prozac and Valium, by February 2000, he began taking Tylox, then Lortab, and by June 2000 was started by Dr. Kneisl on a 20mg twice a day dose of Oxycontin to control his increased pain. Although he continued working, this became more and more difficult.
6. By 2001, the maintenance manager who had hired plaintiff and who had worked with him to allow a more supervisory role as his pain increased was no longer at the Adams Mark. A new hotel manager terminated plaintiff on May 29, 2001.
7. Plaintiff obtained new employment beginning August 27, 2001, working in area maintenance for Carolinas Medical Center (CMC). His task was to walk his assigned hospital floor and ensure that fixtures and hospital beds were in working order. This job was lighter than his previous employment. By Form 21 approved on February 6, 2002, defendants accepted the 1999 left elbow re-injury as a compensable material aggravation of plaintiff's preexisting elbow injury and agreed that the period of unemployment between the termination by Adams Mark and the hiring by CMC constituted a period of total disability caused by the compensable injury.
8. Although the job position at CMC was physically light, plaintiff's increasing pain symptoms made it difficult for him to continue working. Dr. Kneisl prescribed increasing doses of Oxycontin. Plaintiff and Dr. Kneisl discussed the possibility of removing some hardware that remained in plaintiff's arm from the original surgery in 1993 as an operation that potentially could help his pain. Dr. Kneisl made it clear that the surgery could also worsen plaintiff's RSD. After initial reluctance, plaintiff decided to go forward with the surgery.
9. Plaintiff's increasing left arm pain throughout 2002 was a direct and natural result of the compensable re-injury of his left elbow in 1999. The need for surgery to remove hardware in plaintiff's elbow was a direct and natural result of this increased pain and therefore of the 1999 re-injury.
10. On November 21, 2002, Dr. Kneisl took plaintiff out of work and performed the surgery to remove the hardware. Plaintiff had significant post-operative pain, which improved somewhat with time, but still represented an exacerbation from prior to the surgery. Plaintiff became totally disabled on the date of surgery and had not returned to work as of the date of hearing before the deputy commissioner.
11. Since the 1999 re-injury, plaintiff has undergone numerous trials of different treatments, including blocks, injections, gym therapy and coping mechanisms. A course of physical therapy increased plaintiff's pain. One of his pain management physicians, Dr. Thomas Heil of Southeast Pain Care, indicated that plaintiff's pain is likely to have become central; that is, ingrained into the central nervous system and therefore no longer amenable to treatment by blocking peripheral nerves.
12. The increase in plaintiff's depression was a direct and natural result of plaintiff's increased pain from his surgery of November 21, 2002.
13. A Form 21 agreement was approved on February 6, 2002. The Form 21 agreement stipulates an average weekly wage of $451.66, yielding a compensation rate of $301.10.
14. The undersigned have reviewed all expert witness depositions listed in paragraph 6 of the Stipulations section of this Opinion and Award. There is conflicting evidence as to whether plaintiff is totally and permanently disabled for the remainder of his life.
15. Dr. T. Kern Carlton performed an independent medical evaluation of plaintiff on November 11, 2004. Dr. Carlton is board certified in physical medicine and rehabilitation.
16. In 1995, Dr. Carlton treated plaintiff under a comprehensive interdisciplinary program. Dr. Carlton indicated during his testimony that this program was a success, and that he would recommend the program again for plaintiff, as plaintiff was eventually able to return to work following the original 1993 left upper extremity injury.
17. Dr. Carlton indicated he reviewed all of the medical records forwarded to his attention as indicated in his medical record. Dr. Carlton was of the impression that plaintiff had sustained a Monteggia fracture and radial head resection, left elbow contusion, and removal of hardware. Dr. Carlton also indicated that plaintiff suffered from depression, obesity, and lower extremity edema. Dr. Carlton was of the opinion that the best treatment option for plaintiff would be a comprehensive interdisciplinary pain management and rehabilitation program. This would consist of education, psychological counseling, a vocational component, and pain mediation management. The goal of this program would be to improve plaintiff's functioning and physical abilities. Dr. Carlton testified that the program would provide plaintiff relief, help effect a cure, or lessen his disability. Dr. Carlton based his opinion on his review of plaintiff's medical records, his examination, and plaintiff's previous progress through an interdisciplinary program. Dr. Carlton testified that this program could help plaintiff as in 1995.
18. Dr. Carlton indicated that his was the only program of its kind in the immediate Charlotte area. Dr. Carlton testified that there are other similar programs at Wake Forest Medical Center, in Hickory, and in High Point, although none are identical to his interdisciplinary rehabilitation program.
19. The undersigned find, based on the totality of evidence, including Dr. Wallace's medical notes before and after November 16, 1999, that plaintiff's psychological condition was not aggravated by the November 16, 1999 accident until the hardware removal of November 21, 2002.
20. The undersigned finds that plaintiff has alternative treatment modalities available and finds that plaintiff is not permanently totally disabled at this time. Plaintiff is still temporarily totally disabled due to the November 16, 1999 aggravation. Further, the undersigned finds Dr. T. Kern Carlton's treatment recommendations will provide plaintiff relief, help effect a cure, or lessen his disability.
21. Defendants have not willfully failed to comply with any statutory requirement which would result in an increase in plaintiff's compensation.
22. Defendants did not defend this claim without reasonable ground.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On November 16, 1999, plaintiff sustained a compensable injury to the left upper extremity arising out of and in the course of his employment with defendant-employer. Defendants accepted plaintiff's claim as compensable. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's pre-existing psychological and psychiatric condition was significantly aggravated as a proximate cause of plaintiff's compensable injury. However, this aggravation did not occur until plaintiff underwent surgery on November 21, 2002. Therefore, defendants are only responsible for psychological and psychiatric treatment and medication after November 21, 2002 and continuing. N.C. Gen. Stat. §§ 97-2, 97-25.
3. An agreement between the employer, carrier and employee for the payment of compensation benefits, when approved by the Commission, is binding on the Parties. N.C. Gen. Stat. § 97-17 provides that the Commission can set aside a Form 21 Agreement if it appears that the agreement was entered into on the basis of fraud, misrepresentation, undue influence or mutual mistake.
4. The Form 21 Agreement in this matter sets out a correct average weekly wage, and there was no fraud, misrepresentation, undue influence, or mutual mistake. Therefore, this agreement may not be set aside pursuant to N.C. Gen. Stat. § 97-17. Plaintiff's average weekly wage is $451.66, yielding a compensation rate of $301.10. Id.
5. Defendants did not willfully violate any safety statute or regulation. N.C. Gen. Stat. § 97-12.
6. Defendants did not defend this claim in an unreasonable manner. N.C. Gen. Stat. § 97-88.1.
7. Plaintiff has failed to prove that he is permanently and totally disabled at the present time or that it would be futile for plaintiff to engage in a job search in light of his medical restrictions, age, education and experience. N.C. Gen. Stat. § 97-29.
8. Plaintiff is entitled to future medical treatment that may effect a cure, lessen his pain, or reduce his period of disability due to his compensable injury. Said medical treatment includes psychological treatment for plaintiff's depression. Plaintiff is ordered to treat with Dr. T. Kern Carlton in the interdisciplinary program recommended by Dr. Carlton and is entitled to have Defendants provide vocational rehabilitation services. Defendants may also offer pain management services to plaintiff with an agreeable pain management specialist. N.C. Gen. Stat. § 97-25.
9. Plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. A reasonable attorney's fee of 25% of the compensation awarded herein is approved for Plaintiff's attorney and shall be paid out of the amount due plaintiff.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. The Form 21 agreement in this matter shall not be set aside. The amount listed as plaintiff's average weekly wage on the original Form 21 shall continue to be used by defendants to compute plaintiff's average weekly disability compensation. Defendants shall continue to pay plaintiff temporary total disability compensation at the weekly rate of $301.10 and continuing until plaintiff returns to work or further order of the Commission, subject to the approved attorney's fee of 25%.
2. Defendants shall continue to pay for all medical treatment for plaintiff's left arm as a result of his November 16, 1999 injury. This includes Dr. Carlton's interdisciplinary program and pain management services.
3. Defendants shall pay for plaintiff's psychiatric treatment from November 21, 2002 and continuing for so long as said treatment effects a cure, gives relief or tends to lessen plaintiff's period of disability.
4. Plaintiff's claim for additional attorney fees is denied.
5. Plaintiff shall cooperate with the medical treatment offered by defendants, including Dr. Carlton's interdisciplinary program and pain management services.
6. The Defendants shall pay the costs
This the ____ day of December, 2005.
 S/_________________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_________________ CHRISTOPHER SCOTT COMMISSIONER
 S/_________________ PAMELA T. YOUNG COMMISSIONER